## Case No. 8,023.

LAMB et al. v. VAUGHN et al.

VAUGHN v. LAMB et al.

[2 Sawy. 161.] [1]

Circuit Court, D. Oregon. March 28, 1872.

REAL PROPERTY—OREGON DONATION ACT — BOND TO CONVEY LAND—ESCROW—USAGE—SALE BEFORE ACQUIRING TITLE.

1. The bond given by Lownsdale to Pettigrove upon the purchase of the Portland land claim on September 22, 1848, *held* not to be a covenant on the part of Lownsdale to convey the lots therein specified as exempted from such sale to Pettigrove or his grantees; and also that such lots are not included in the fourth covenant of the instrument of March 10, 1852, called the "escrow," and therefore the title which Lownsdale afterwards acquired to such lots from the United States was not acquired in trust for Pettigrove's grantees or their assigns.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

2. The proof of usage, and other matters resting in parol, as to the lots sold by Pettigrove prior to September 22, 1848, is not sufficient to impress a trust upon such lots in the hands of Lownsdale or his heirs in favor of Pettigrove or his grantees, or to estop said heirs from asserting the legal title derived from their ancestor as against said grantees.

3. The bond aforesaid is not a covenant with any one, but the provisions in it concerning such exempted lots only amount to a condition, which Lownsdale was at liberty to comply with, and thus avoid paying the penalty thereof, or disregard and pay such penalty; and that his heirs having since purchased said bond from the owner and obligee therein—Pettigrove—it is no longer of any force or effect as to any one.—Per Deady, District Judge.

4. If such bond could be construed to contain a covenant by Lownsdale to make title to Pettigrove, neither Vaughn nor his grantors could rightfully claim any interest in said lots under it, because they were neither parties nor privies to such covenant. Id.

5. At the date of such bond, neither Lownsdale nor Pettigrove had any interest in the lots in question, and therefore could not impress a trust upon them in favor of any one; and that such trust could not have been created by parol, even if the legal title had been in the parties. Id.

6. The lots sold by Pettigrove are not included in the terms of the fourth covenant of the escrow, and it is manifest that it was not the intention of the parties to that instrument that they should be, from the fact that the tract allotted to Lownsdale in the partition under the escrow includes all such lots. Id.

7. There never was any usage in Oregon by which an occupant of the public lands, who sold a town lot within the limits of his claim by a mere quitclaim deed, was thereafter held to be a trustee to acquire the title for such purchaser or his assigns; and if such usage had in fact existed, it could not control the general law to the contrary. Id.

The original bill in this case was filed by a portion of the heirs-at-law of Daniel H. Lownsdale, late of Portland, deceased, against the other heirs-at-law and defendant, George W. Vaughn, to obtain a partition of lots 1 and 3, block 5; and lots 2 and 8, in block 15, in the city of Portland, Oregon. The original bill alleges that the said heirs-at-law of Lownsdale are the owners, in fee, of said lots, but that said George W. Vaughn is in possession claiming some right to said property, and praying that the title of said heirs be quieted as against him, and a partition made. The respondent, Vaughn, after answering the original bill, files a cross-bill against all the said heirs-at-law of Lownsdale, deceased, in which he alleges certain facts, which, he claims, confer upon him an equitable title to the premises in question, and he asks that the said heirs may be adjudged to hold the legal title in trust for him, and be required to convey such legal title. The heirs answer the cross-bill, denying many of the material facts alleged, and issue is joined by general replication. At the hearing, it was stipulated that the legal title to the property described in the bill of complaint, is in the heirs of Lownsdale named in the bill, and that they are entitled to the partition prayed for in the original bill, unless the matters set forth in the cross-bill are true in fact, and sufficient in a court of equity to entitle the complainant therein to the relief sought.

The following facts, among others, appear, either by the admissions of the pleadings, or the evidence introduced: Prior to, and on September 2, 1848, one Francis W. Pettigrove was, under the rules, regulations and usages, as they existed under the provisional and territorial governments of Oregon, in the possession of a tract of land, containing six hundred and forty acres, and known as the "Portland Land Claim," with valuable improvements thereon. Said land claim embraces a large portion of the present city of Portland. Either he, or his predecessor in the possession of the claim, and assignor, had laid off a portion of said land into a town, consisting of sixteen or more blocks, numbered consecutively from 1 to 16, inclusive; said blocks being sub-divided into lots of fifty by one hundred feet in extent, among which were the said lots in question. Prior to said September 22, 1848, he had sold to various parties sundry lots so laid out, and conveyed his interest therein to the several purchasers by quitclaim deeds, and among them the lots in controversy. The purchasers of the said lots in controversy, and other grantees, went into possession thereof, and erected valuable improvements thereon, and the said Vaughn, complainant in the cross-bill, is now in possession of said lots and improvements, claiming to have acquired, by proper mesne conveyances, all the rights derived by the said purchasers from the said Pettigrove. On the said September 22, 1848, said Pettigrove executed and delivered to said Daniel H. Lownsdale, since deceased, an instrument of writing, a copy of which is annexed to the cross-bill, and therein designated as "Exhibit A," by the terms of which, the said Pettigrove purported, in consideration of certain matters therein mentioned, to "have bargained, remised and forever released" to said Lownsdale, his heirs and assigns, all and singular, his "right, title, interest, claim and demand, at law and in equity, present and in expectancy," to all the lands therein particularly described, being the lands embraced in said land claim of six hundred and forty acres, "not hereinafter excepted and reserved from the operation of these presents." The said instrument then provides that, "the following lands, blocks and lots, together with the hereditaments and appurtenances, are hereby expressly excepted and reserved from the operation of these presents, that is to say, blocks No. 1," etc., including the premises in question, "which said lots and blocks so hereby expressly reserved, have been sold by me as town property, to different persons, with the exception of the lots upon which my store is situated, reserved also, for me." At the same time, and as a part of the same transaction, the said Lownsdale executed and

delivered to the said Pettigrove a bond, a copy of which is set out in the said cross-bill, and therein designated as "Exhibit B," in the penal sum of five thousand dollars, payable to said Pettigrove, his heirs, etc., upon the condition following, to wit: "The condition of this obligation is such, that whereas the above bounden, Daniel H. Lownsdale, has this day purchased all the land claim of the said Francis W. Pettigrove, situate in the said county of Tualatin, upon which is laid out the village of Portland, except blocks one," etc., (describing the lots and blocks excepted in the conveyance to Lownsdale, aforesaid, and including the premises in question,) "which said lots, blocks and parcels of land are hereby expressly exempted and reserved from said sale; now if the said Daniel H. Lownsdale shall do and perform all reasonable exertions to procure from the territorial government of Oregon, and the general government of the United States, a good and sufficient title to and for the said land claim, and shall in no way sell, transfer, or incumber the lands and tenements above specified and exempted from said sale, then the above obligation shall be null and void; otherwise in force." After the execution of said instruments by the said parties, the said Lownsdale, in pursuance of the said sale and conveyance, went into possession of said land claim, as so assigned and conveyed to him, and so continued in possession, and continued to sell town lots within said part of the town as laid out, till March 30, 1849, on which day he executed and delivered to one Stephen Coffin, an instrument of which a copy is annexed to said cross-bill, and designated "Exhibit C;" and the said Lownsdale and Coffin mutually executed and delivered, at the same time, and as a part of the same transaction, another instrument, a copy of which is annexed to said cross-bill, and designated "Exhibit D." Afterwards, the said Lownsdale, Coffin, and one W. W. Chapman, at their respective dates, executed and delivered the several other instruments, copies of which are annexed to said cross-bill, and designated Exhibits E and F. The said Exhibits C, D, E and F, are the same mentioned in the opinion in the cases of Lamb v. Davenport and Davenport v. Lamb [Case No. 8,015]. The further acts of the said Lownsdale, Coffin and Chapman, shown by the admissions of the pleadings and the evidence in this case, under and in connection with said instruments, conveyances, agreements and land claims, down to and including the issuing of a patent by the United States to said Lownsdale to a portion of said Portland land claim, including the premises now in controversy, on June 6, 1865, are the same as recited in the opinion in those cases, and need not be repeated here.

W. W. Chapman, for complainant.

W. Lair Hill, W. W. Thayer, and E. C. Bronaugh, for defendants.

Before SAWYER, Circuit Judge, and DEADY, District Judge.

SAWYER, Circuit Judge. The first question to be determined is, whether the lots now in controversy are embraced within the covenants contained in said agreement, of which Exhibit F is a copy, commonly known in Portland as the "escrow." If so, then the decision in the case of Lamb v. Davenport [Case No. 8,015], will control this case. The said instrument is an agreement between Lownsdale, Coffin and Chapman. After reciting that said parties "have heretofore, up to the date of these presents, been joint proprietary claimants to the tract of land * * * * * upon which a part of the city of Portland is laid out," and that "the said Lownsdale, Coffin and Chapman have sold lots in said city of Portland, to each other and to third persons, obliging themselves to make to the grantee, or grantees, a deed of general warranty, whenever the grantor shall obtain a patent from the government of the United States for the same;" also, reciting an agreement to divide the claim, and present separate tracts in the separate name of each for a patent; each covenants with the others, among other things: "1st. That he will fulfill and perform all contracts and agreements which he has heretofore entered into with the others, or with each of them, or with other persons, respecting the said tract of land, or any part thereof * * *;" and "4th. That when a patent shall be so obtained, he will make a good and sufficient deed of general warranty, for all lots or parts of lots in the part or tract so patented to him, which may heretofore have been sold, or agreed by the said parties, jointly, or any of them separately, to be sold, the said deed, of course, in all cases to be made to the grantor, his heirs, executors, administrators or assigns, or grantee or grantees, as the case may be." Unless the lots in question are within the scope of one of these two covenants, they are in no way affected by this agreement.

It is insisted, on the part of the complainant, in the cross-bill: Firstly, that the covenant by Lownsdale, "that he will fulfill and perform all contracts and agreements which he has heretofore entered into * * * with other persons respecting this said tract of land, or any part thereof," in terms embraces the bond given to Pettigrove, of which said Exhibit B is a copy, and that under the condition of that bond Lownsdale was bound, upon his acquisition of title, to convey to Pettigrove's grantees, one of whom is said complainant, such lots as Pettigrove had quitclaimed before his sale to Lownsdale, and as were mentioned as reserved in his conveyances to the latter, and in the said bond.

Conceding the bond to be one of the contracts embraced in this covenant, it will be necessary to ascertain what obligations

Lownsdale assumed in that bond, which he is required by this covenant to "fulfill and perform." The condition of the bond, it must be confessed, we think, is somewhat anomalous, and the objects to be accomplished are not very satisfactorily expressed. It is in these words: "Now if the said Daniel H. Lownsdale shall do and perform all reasonable acts, and make all reasonable exertion to procure from the territorial government of Oregon and the government of the United States a good and sufficient title to and for said land claim, and shall in no way sell, transfer or incumber the lands and tenements above specified and exempted from said sale, then the above obligations shall be void; otherwise, in force." Why should Pettigrove bind Lownsdale, under heavy penalties, to procure title from the government to the land claim, unless he expected to derive title from Lownsdale to those lots reserved for his own use, and unless he expected his prior grantees to be benefited by the act as to the lots already sold and excepted from his conveyance to Lownsdale? And why, also, obligate him under similar penalties to "in no way sell, transfer or incumber the lands and tenements above specified and exempted from sale" after so acquiring "a sufficient title" thereto from the government? Why should Pettigrove be so solicitous to require Lownsdale to procure title to the lots reserved from sale, as having been sold to other parties, as well as the rest reserved for Lownsdale's own benefit, and then, having obtained the title, oblige him, under heavy penalties, to forego all enjoyment of his property by putting it out of his power in any way to rightfully "sell, transfer or incumber" them?

It is not easy to give a satisfactory answer to these queries, and yet the plain import of the language used, is only to oblige him to procure title, and then not to sell, transfer or incumber certain designated lots. It cannot possibly be expanded into a covenant in terms to convey the lots designated to Pettigrove and his prior grantees, or to hold them in trust for said parties. To so construe it, would be to interpolate language which Lownsdale himself has not used, to add to, rather than to construe, the language of the contract. The testimony of the attorney who drew the instrument, is offered to show what the parties intended by the language used, but this was wholly inadmissible. The parties put their contract in writing, so that there might be no occasion to prove it by parol testimony. Having put it in writing, the intention of the parties must be derived from the language they have adopted. The contract is, in all other respects, in due legal form. It was drafted by an attorney, and is not open to liberal presumptions, on the ground that it was drawn by a layman, unused to legal forms and phraseology, who has used inartificial language. The language itself is plain enough to express the idea embraced in it. It expresses distinctly and clearly an idea in exact and artistic language, and one, in itself, proper to be expressed in a contract, but it does not express the idea, or the covenant, now claimed for it.

The difficulty is, not in ascertaining what the words do in fact express, but in bringing within the words used, a covenant which they do not and cannot of themselves be made to express. If the parties intended to covenant for the conveyance by Lownsdale to Pettigrove and his prior grantees, of the lots designated after he should acquire the title, they have signally failed to express it.

Says Greenleaf: As the parties "have constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it or substituted in its stead. The duty of the court in such cases is to ascertain, not what the parties may have secretly intended, as contradistinguished from what their words express, but what is the meaning of the words they have used." 1 Greenl. Ev. 277.

This rule is applicable in equity, where the instrument is presented collaterally for construction, as in this case, as well as in cases at law. If a term in the contract is omitted or misstated through fraud, accident or mistake, the contract must first be reformed by a direct proceeding in equity, in which the fraud, accident or mistake is alleged and clearly shown, before it can be enforced according to the true intent of the parties.

In this case we are not called upon to reform a contract, but to construe and enforce it as it is written. This being so, we are not authorized to expand the covenants beyond the plain and natural import of the words as we find them. And we find nothing in the condition of the bond under consideration, requiring Lownsdale to convey the lots therein designated, to Pettigrove and his grantees, or to hold them in trust for their use.

The said complainant in the cross-bill claims: Secondly. That the lots in question fall within the fourth clause of the escrow, which provides that "he will make a good and sufficient deed of general warranty for all lots, or parts of lots, in the part or tract so patented to him, which may heretofore have been sold, or agreed by the said parties jointly, or any of them separately, to be sold." The claim is that the words "heretofore have been sold," is not limited to sale by one or more of the three parties to the agreement, but is general, including all lots which "heretofore have been sold" by any party in the chain of title to the possession set out, by whomsoever sold; that it embraced the sales by Pettigrove of the lots designated in his conveyance to Lownsdale, and in the aforesaid bond as excepted, and also excepted in the subsequent agreements between Lownsdale and Coffin, and Lowns-

dale, Coffin and Chapman jointly; or any of them separately. It is also insisted, if we understand the argument, ·that the words "to be sold" should be read as if written "to have been sold;" and the term "agreed," in the sense of "admitted," or "conceded;" that is to say, agreed, admitted or conceded by the said parties in the various contracts set out to have been sold.

And the fact that these lots had been excepted, as having been sold as town property, in all the various prior instruments of conveyance or agreements, is referred to as matter in pari materia, to show the meaning intended to be expressed by the language under consideration.

This is certainly very ingenious, and very acute criticism, but, in our minds, more specious than sound.

As to the words "agreed," "to be sold:" The words "jointly, or any of them separately," would never have been used to qualify the word agreed, used in the sense indicated. They certainly would not say by the said parties, jointly, or any of them separately admitted to be sold, or to have been sold. They do not mean a joint or separate admission. The agreement by which the lots in the clause in question were agreed to be sold—by which the sales intended were effected—is clearly what is intended, as jointly or separately made. That is to say, the lots intended to be covered by this clause were lots which one or more of these three parties to this instrument—the escrow—had agreed to sell; which said parties jointly, or any of them separately, had agreed to sell.

The meaning of this clause being determined, we think it clear that the phrase "said parties, jointly, or any of them separately," also qualifies the phrase "which may, heretofore, have been sold," as well as the phrase "agreed to be sold." The former phrase is immediately followed by the latter, coupled by the conjunction "or." It evidently means lots "which may heretofore have been sold by said parties jointly, or any of them separately, or agreed, or contracted to be sold, by said parties jointly, or any of them separately." This is the natural grammatical construction of the language—the construction by far the most obvious, and the one which first strikes the mind. It is the form which any party desiring to express that idea would be most likely to hit upon. The other construction would be strained and unnatural. The form of expression is not one at all likely to be adopted by any party desiring to express the idea now claimed for it. After a careful examination of this fourth covenant, in connection with the entire instrument, we are of the opinion that it does not embrace lots sold by Pettigrove, or any persons other than the parties, or some one or more of the parties, to the instrument in which it occurs. If we are right in the construction given to the covenants under consideration, this case does not fall within the principle adopted in Lamb v. Davenport [supra].

Having determined that there is nothing in the several contracts in writings set up in the cross-bill, to entitle the .complainant therein to the relief sought, it becomes necessary to ascertain whether there is any other matter alleged and proved, sufficient to establish a trust in his favor in the premises in controversy.

Prior to the issuing of the patent to said Lownsdale, the title was in the United States, and there was no law by which title could be acquired before the passage of the act of congress of September 27, 1850 [9 Stat. 497]. commonly called the "donation act," under the provisions of which the patent to Lownsdale was issued, June 6, 1865. There are general averments of a usage for ·one man to take up a land claim upon the public lands, lay it off into town lots, and sell them out to individuals with a general expectation that at some future day, a title would, in some· way, be obtained by the general claimant for the benefit of all who had purchased under him, and that when obtained he would convey to his vendees such lots as he .had sold; that the claim in question was taken up in this mode; that there was a general expectation that parties who had bought from Pettigrove would obtain title from him as claim-holder, or from his assignees of the general claim, in case they should ultimately obtain title; that this expectation and the fact of occupancy were known to Lownsdale, Coffin and Chapman; that the patent was obtained with a knowledge of these expectations, etc., etc. It would be a laborious and tedious, but an unnecessary and unprofitable task, to particularly state and discuss, at large, the allegations of the cross-bill, and testimony supposed to be applicable thereto. Similar .allegations were made in the cross-bill, and similar evidence introduced in the case of Lamb v. Davenport, supra. Though we did not, then, particularly discuss in the decision rendered this aspect of the cross-bill, it was considered by the court, and it was said in one of the opinions in that case, that "the decision of this action should turn upon the validity, construction and effect of the said various contracts and conveyances, copies of which are annexed to the cross-bill." After a careful re-examination of this branch of the case, we are still satisfied that, unless a trust can be established under the said several written instruments, there is no basis shown upon which a trust can be rested. There is no direct contract in any way relating to these lots, either verbal or written, upon any consideration moving between the parties, Lownsdale and complainant, Vaughn, or any of the latter's grantors, or otherwise, subsequent to the said bond to Pettigrove, already considered. This bond is the only contract to which Lownsdale was a party, or privy in any way affecting the title to the lots sold by Pettigrove before the latter's convey-

ance to Lownsdale, and this contract, according to the construction already given, affords no foundation for the establishment of a trust. In no other way, until the issuing of this patent, has Lownsdale been brought by any valid agreement into relations either with these lots or with the rights therein of complainant in the cross-bill. He never purchased the lots, and never had or claimed any interest in them, till he acquired an interest under the said donation act. It was, therefore, a matter of no concern to him what use was made of them by the parties in possession, before he himself acquired any rights therein, and he had no occasion to object to, or interfere with, the action or the possessor, or the claimants under Pettigrove. Nothing has transpired since the patent issued to affect the rights of the parties.

Without a further particular discussion of the facts, we shall content ourselves with stating in general terms our conclusion, that no contract or agreement, verbal or written, valid either in law or equity, has been shown between Lownsdale and the complainant in the cross-bill, or any party under whom he claims, by which Lownsdale or his heirs can be compelled to convey the title derived from the United States to the premises in controversy; and that there are no acts in pais shown which would justify a court of equity, upon any established principles, in impressing the premises in controversy in the hands of Lownsdale's heirs with a trust in complainant's favor.

The very general and vague expectations and acts indicated by the testimony, and relied on by the complainant in the cross-bill to establish his equity, outside of the written contracts exhibited, would afford a very unsafe foundation for a court of equity to build a trust upon, whereby titles to real estate are to be changed. We know of no case where trusts have been impressed upon real property upon so unsatisfactory a showing. Whatever the mere moral aspect of the case may be, we are satisfied that nothing has been shown which entitles the complainant in the cross-bill to the relief demanded, upon any known principle of equity jurisprudence. Our views upon this branch of the case, were indicated at the last May term of this court, by our action in striking out of several similar bills, on the ground of impertinence, much of the matter alleged in the cross-bill in this case, relied on as the foundation of complainant's equity. Further reflection confirms the view then taken.

It is unnecessary for the purposes of our decision under the view taken of the other points, to determine whether the complainant in the cross-bill has connected himself by proper mesne conveyances with Pettigrove's grantees. As to some of the lots, at least, we strongly incline to the opinion that he has not done so. But, for the purposes of this decision, we have assumed, without deciding the question, that he has succeeded to all the rights of Pettigrove's grantees. The cross-bill must be dismissed, and a partition made among the heirs of Lownsdale, deceased, according to the prayer of the original bill. Let a decree be entered accordingly, with costs.

DEADY, District Judge. I concur in the opinion and conclusion of the circuit judge, and only wish to add:

1. That in my judgment, the bond from Lownsdale to Pettigrove, was given merely for the personal security or benefit of the latter, and that the provisions in it do not amount to a covenant with any one, but only constitute a condition, which the former was at liberty to comply with, and thus avoid the payment of the penalty thereof, or disregard and abide the consequence—that is, become liable to the payment of such penalty—and that such bond having been purchased by the defendants and heirs of said Lownsdale, the obligor therein, from Pettigrove, the obligee, it no longer has any force or effect as to any one.

2. That if such bond could be construed as a covenant upon the part of Lownsdale "to do and perform all reasonable acts, and make all reasonable exertion to procure from the territorial government of Oregon and the government of the United States a good and sufficient title to and for said land claim," and to "in no way sell, transfer or incumber the lands and tenements above specified and exempted from said sale," it was a covenant with Pettigrove only, and one to which neither Vaughn nor his grantors were or became parties or privies, and therefore, neither he nor they could rightfully claim any interest under it, or maintain any suit to enforce it, or for its non-performance.

3. That at the date of such bond—September 22, 1848—neither Lownsdale nor Pettigrove had any interest in, or right to, this land, and therefore could not, by any act of theirs, or either of them, impress or fasten a trust upon it in favor of any one.

4. In the partition of the land claim between Lownsdale, Coffin and Chapman, under the escrow, it being purposely arranged that the tract allotted to Lownsdale should include all the lots previously sold by Pettigrove, this fact itself shows that neither Coffin nor Chapman considered themselves in any way personally interested in such sales or lots, or the obligations or agreements existing between Lownsdale and Pettigrove concerning them, and that there is therefore no reason to believe—if there was otherwise any doubt about it—that the parties to the escrow ever contemplated or thought of including such sales or lots in the fourth covenant of such instrument.

5. As to the matters outside of the written instrument, which are relied upon to establish a trust in these lots in favor of Vaughn and his grantors, or to estop the defendants from asserting the legal title thereto derived from their ancestor, the testimony offered in sup-

port of them is in the greater part incompetent, and that which is admissible at all is far from sufficient to prove either the alleged trust or estoppel.

The proposition that there ever was a usage in Oregon by which an occupant of the public lands who sold a town lot within the limits of his claim or occupation, by a mere quitclaim deed, was, notwithstanding, considered a trustee to acquire the legal title in said lot from the United States for the benefit of the grantee in such deed or his assigns. is simply preposterous; nor could such a usage, if it existed in fact, be allowed to control or modify the general rule of law to the contrary. But in fact, the evidence in this case, when estimated according to its worth, shows what every one, familiar with the early history of the country, knows to be true, that as a rule, the purchaser of any portion of the public lands from a prior occupant thereof, if he bargained for anything beyond the mere possession, had a stipulation or covenant inserted in the contract, bond or deed to that effect.

Again, the statute of frauds was in force in Oregon during all the period covered by these transactions, and therefore no trust in this land could be established by parol, even if the parties had had such an interest in the soil as would enable them to impress a trust upon it; nor do the facts proven concerning the acts and declarations of Lownsdale as to his interest in or right to the premises, constitute an estoppel when considered in connection with the situation of the parties, and the apparent uncertainty of the title, although it now appears as a matter of law that the legal title to the lots in question was in Lownsdale, as a donee of the United States, under the act of September 27, 1850, from the date of his settlement on the land claim.

[NOTE. For other suits by the same plaintiffs against other claimants of interest in the "Portland Land Claim," see Cases Nos. 8,012, 8,017, 8,015. 8,024. For suits brought against these plaintiffs in the same matters. see Cases Nos. 4,767. 4,775, 4776. For suits brought by the plaintiffs for their interest under Nancy Lownsdale, see Cases Nos. 8,021, 8,022, 8,013.]